## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES OF AMERICA**

**v.**

**DRESTEN TORON DANIELS,**

    **Defendant.**

**CRIMINAL ACTION FILE**

**NO. 1:23-CR-125-MHC-RGV-11**

## ORDER

Defendant Dresten Toron Daniels ("Daniels") has been charged in a multi-count superseding indictment with other co-Defendants on one count of conspiring to possess with the intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count One); one count of possession with the intent to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Count Eleven); one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Twenty-Two); and one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count Twenty-Three). First Superseding Criminal Indictment [Doc. 528]. This action comes before the Court on the Final Report and Recommendation ("R&R") of United States Magistrate Judge Russell G. Vineyard [Doc. 737] recommending the denial of Daniels's Motion to Suppress

Search Warrant and Request for Franks Hearing ("Mot. to Suppress 1") [Doc. 381], Daniels's Motion to Suppress Search and Seizure of Defendant's Vehicle Resulting From Unconstitutional Traffic Stop and K-9 Search ("Mot. to Suppress 2") [Doc. 382], and Daniels's Perfected Motion to Suppress to Address Standing for Doc. 381[1] [Doc. 416].

The Order for Service of the R&R [Doc. 738] provided notice that, in accordance with 28 U.S.C. § 636(b)(1), the parties were authorized to file objections within fourteen (14) days of the receipt of that Order.    Daniels has filed his objections to the R&R ("Def.'s Objs.") [Doc. 750], to which the Government has filed a response [Doc. 759].

## I.    LEGAL STANDARD

In reviewing a Magistrate Judge's R&R, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to.  Frivolous, conclusive, or general objections

---

[1] Standing was established for both motions to suppress [Docs. 566 & 604], so to the extent that Daniels's filing of a "perfected" motion to suppress was intended just to argue standing to file the prior motions to suppress, it is **DENIED AS MOOT**.

need not be considered by the district court." United States v. Schultz, 565 F.3d 1353, 1361 (11th Cir. 2009) (quoting Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988)). If there are no specific objections to factual findings made by the Magistrate Judge, there is no requirement that those findings be reviewed *de novo*. Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993) (citations omitted). Moreover, "a party does not state a valid objection to an R&R by merely incorporating by reference previous filings." Hammonds v. Jackson, No. 13-CV-711-MHS, 2015 WL 12866453, at *6 n.2 (N.D. Ga. May 18, 2015); see also Morrison v. Parker, 90 F. Supp. 2d 876, 878 (W.D. Mich. 2000) ("Plaintiffs' general, nonspecific objections, purporting to incorporate by reference their earlier brief, are tantamount to no objection at all and do not warrant further review.") (citations omitted).

Absent objection, the district court judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge," 28 U.S.C. § 636(b)(1), and may accept the recommendation if it is not clearly erroneous or contrary to the law. FED. R. CRIM. P. 59(a). In accordance with 28 U.S.C. § 636(b)(1) and Rule 59 of the Federal Rules of Criminal Procedure, the Court has conducted a *de novo* review of those portions of the R&R to which Ortiz

objects and has reviewed the remainder of the R&R for plain error.  See United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

## II.    FACTUAL BACKGROUND

### A.    Circumstances Prior to Law Enforcement Contact with Daniels

In June 2019, the Drug Enforcement Administration ("DEA") initiated an investigation into the Paper Gang Family ("PGF"), whose members were distributing kilogram quantities of methamphetamine, cocaine, and other controlled substances in the Atlanta metropolitan area.  Tr. of May 14, 2024, Evidentiary Hr'g ("Tr.") [Doc. 627] at 10,[2] Aff. in Supp. of Search Warrant ("SW Aff.") [Doc. 381-1] ¶ 11.  Austin Boswell ("Boswell"), a member of the Walton County Sheriff's Office was assigned as a Task Force Officer ("TFO") to the DEA in September 2020 to assist other agents in conducting the investigation.  Tr. at 6-7.

As a part of the investigation, DEA agents installed a pole camera that could observe and record the street and driveway areas adjacent to the residences located at 2555 and 2558 Stanford Drive in Ellenwood, Georgia, which were in an area that members of the PGF referred to as "The Neighborhood" and in which drug

---

[2] The citations to the transcript are to the transcript page numbers located at the upper right corner of each page as opposed to the numbers on the docket.

transactions were conducted. Id. at 14-16, 26-27; SW Aff. ¶ 12. On December 29, 2022, while TFO Bowell was monitoring the pole camera,[3] a silver Toyota Camry arrived at the front of 2555 Stanford Drive, and about two to three minutes later, a gray Infiniti SUV arrived at the same location and backed into the driveway. Tr. at 16, 19. The driver of the Toyota Camry, Arthur Hempen, a known PGF member, exited the Camry, retrieved a white trash bag from the rear seat, and carried it to the driver of the Infiniti, Christian Wash ("Wash"), another known PGF member. Id. at 10-12, 19-20, 22-24, 26. TFO Boswell observed that the white trash bag appeared to have numerous rectangular-shaped objects in it, which based on Boswell's experience and training, appeared to be illegal narcotics. Id. at 20, 25. TFO Boswell contacted members of his DEA group to conduct further surveillance, and also contacted the Georgia State Patrol ("GSP") to assist by conducting a traffic stop of the Infiniti. Id. at 27-28.

Wash then drove the Infiniti from Stanford Drive to another house inside The Neighborhood off Springfield Place, and then DEA agents observed the Infiniti driven back to 2555 Stanford Drive, followed by a white van driven by

---

[3] TFO Boswell was able to monitor the pole camera images from his desk, on his cellphone, and on his tablet. Id. at 30. Portions of the video recording was admitted into evidence as Government Exhibits 3, 4, and 5. Id. at 18-19.

Mario Peek ("Peek"), another known PGF member. Id. at 11, 36-37. Both the
Infiniti driven by Wash and the van driven by Peek backed into the driveway of the
residence. Id. at 38-39. Shortly thereafter, a black Mercedes sedan backed into the
driveway of 2555 Stanford Drive next to the Infiniti, and Wash greeted the driver
of the Mercedes, later identified as Daniels. Id. at 39-44. Wash retrieved the white
trash bag from the back of the Infiniti, opened the back passenger door of the
Mercedes sedan, and placed the trash bag on the back seat. Id. at 44-45. The white
trash bag was then handed to Daniels who placed the bag in the trunk of the
Mercedes. Id. TFO Boswell testified that this appeared to be the same white trash
bag that was seen earlier in the day given by Hempen to Wash which, based upon
Boswell's training, experience, and earlier observations meant that "Daniels
arrived to Stanford Drive to pick up the white trash bag of suspected drugs." Id. at
45-46.

Daniels left the area and was followed by DEA agents to a nearby Citgo gas
station. Id. at 47. GSP Trooper Brian Harmon ("Trooper Harman"), who was
assisting the DEA on December 29, 2022, was advised of the events leading to the
appearance of the black Mercedes at the Citgo gas station, including the placement
of the trash bag with suspected narcotics in the vehicle. Id. at 68-75. Daniels then

began traveling north on Moreland Avenue and DEA agents requested that Trooper Harman conduct a traffic stop on the vehicle.  Id. at 75-76.

### B.    The Traffic Stop and Subsequent Arrest

Trooper Harman followed the black Mercedes driven by Daniels and observed that the Mercedes "had extremely dark window tint to the point to where if I looked at the window of the vehicle, [ ] you couldn't see the silhouette of the person driving the vehicle," which in Trooper Harman's experience, meant that the tint was likely darker than the legal limit in Georgia.   Id. at 76-77.  As Trooper Harman prepared to conduct a traffic stop, the Mercedes made a quick left turn onto Conley Road, cut off several cars, and accelerated down the road into a scrapyard "as if [Daniels] was trying to" flee.  Id. at 78-79.  Trooper Harman activated his blue lights and the Mercedes stopped inside the scrapyard.  Id. at 80.

Trooper Harman observed that the passenger's side window was open and the driver was talking to an elderly man.  Id.  Trooper Harman approached the Mercedes and asked the driver to roll down the rear driver's side window because it was too dark to see inside the vehicle and Trooper Harman wanted to ensure there was no person in the back seat.  Id. at 81.  Trooper Harman had a window tint

meter and measured the window tint level, which was thirteen percent, well below the Georgia legal limit.[4] Id. at 82.

Trooper Harman asked the driver, later identified as Daniels, what he was doing at the location, and Daniels replied that he was talking to "my guy about a part for a Blazer," referring to the elderly man previously observed by Trooper Harman, and who at this point was standing next to a female. Id. at 88-89. Trooper Harman asked Daniels for his license, registration, and proof of insurance, and Daniels stated that he wasn't sure if he had the paperwork because it was his wife's vehicle. Id. at 90. Trooper Harman advised Daniels that he was required by law to have proof of insurance and Daniels said he would call his wife and have her send the proof to him. Id. at 91.

At this point, GSP Sergeant First Class Allen ("Sergeant Allen") had pulled up to assist with the traffic stop and had spoken to the female who Trooper Harman had seen earlier and who identified herself as the owner of the scrapyard. Id. at 94-95. The female denied having ever seen Daniels before, and Trooper Harman

---

[4] O.C.G.A. § 40-8-73.1 provides, in pertinent part, that it is unlawful to operate a motor vehicle in the State of Georgia "[w]hich has material and glazing applied . . . to the side or door windows, which material and glazing when so applied or affixed reduce light transmission through the . . . window to less than 32 percent, plus or minus 3 percent[.]"

spoke to the elderly man who also said he did not know Daniels. Id. Based on this information and the manner in which Daniels pulled into the scrapyard, Trooper Harman suspected criminal activity. Id. at 96-97. Troper Harman asked Daniels to step out of the vehicle to question him further about his prior statement and conducted a frisk to make sure Daniels had no weapons. Id. at 98-99. Trooper Harman then asked Daniels if he would consent to a search of the Mercedes, and Daniels declined to give consent. Id. at 100-01.

Trooper Harman then signaled GSP Trooper Micahiah Swain ("Trooper Swain"), who also had arrived to assist with the traffic stop, to start a K-9 sniff of the vehicle. Id. at 101, 105. Daniels at the time still had his cell phone with him and was not handcuffed or detained. Id. at 103. The K-9 and Trooper Swain approached the Mercedes and the K-9 was deployed, who then alerted the troopers to the odor of narcotics.[5] Id. at 105-06. Based off the K-9's alert to the odor of narcotics, as well as the observations that Daniels looked like "he was fixing to run," Trooper Harman "made the determination to detain Mr. Daniels to conduct a probable cause search of the vehicle" and placed Daniels in handcuffs. Id. at 108-

---

[5] Trooper Swain testified that his K-9, Ozon, was trained and certified as a drug detection dog and Trooper Swain himself was certified as a drug detection K-9 handler; moreover, both have been recertified for several years, including the period in which the K-9 sniff of the Mercedes was conducted. Id. at 148-152,

12. Trooper Harman and Sergeant Allen began to search the Mercedes and found in the trunk a black dry-sealed bag that felt like it had smaller bags of marijuana inside. Id. at 113-14. In addition, underneath the spare tire holder in the trunk, there was a white trash bag which contained five large brick-like objects that were wrapped in silver tape and felt like kilograms of cocaine. Id. at 114-15. Daniels was then informed he was under arrest for possession of the narcotics found in the trunk of the Mercedes. Id. at 115.

## C.    The Search Warrant for the Residence

Daniels was originally indicted on April 13, 2023, for conspiracy to possess with the intent to distribute cocaine. Criminal Indictment [Doc. 1]. On April 24, 2023, DEA Agent Brian Tice ("Agent Tice") applied for a warrant to search a number of addresses, including 4725 Ferncrest Place, Douglasville, Georgia, which was identified as the residence of Daniels (the "Ferncrest residence"). SW Aff. ¶¶ 130-32. Tice attested that, based upon evidence previously recovered from Daniels's cell phones pursuant to a warrant, he believed that Daniels "uses [his residence] to store evidence related to the conspiracy, such as cellular telephones used to contact other members of the organization and record pertaining to the renting of drug stash locations" and that Daniels "may keep the actual ledgers" at the residence. Id. ¶ 132.

## III.    DISCUSSION

### A.    The Report and Recommendation

#### 1.    Challenge to Traffic Stop

In his motion to suppress relating to the traffic stop, Daniels contended that he was unlawfully seized because there was no traffic violation, and the seizure was impermissibly extended.  Mot. to Suppress 2 at 3-5.  The Magistrate Judge found that Trooper Harman credibly testified that he had probable cause to believe that Daniels violated O.C.G.A. § 40-8-73.1 because of a reasonable belief that the dark tint on the windows of the Mercedes exceeded the permissible tint level regardless of whether there was an actual violation of the statute.  R&R at 32-34.  The Magistrate Judge also found that the manner in which Daniels cut off several vehicles while turning left into the scrapyard provided an alternate basis for the stop.  Id. at 35.  The Magistrate Judge also found that Trooper Harman had reasonable suspicion to stop the black Mercedes based on the collective knowledge of the law enforcement officers who were investigating the PGF, the observations gleaned from the surveillance of the pole camera, and the actual surveillance of the pertinent vehicles on December 29, 2022, which provided reasonable suspicion that Daniels's vehicle contained evidence of drug trafficking.  Id. at 36-39.  Finally, the Magistrate Judge found that Daniels abandoned his argument that the

traffic stop was unnecessarily prolonged and that, even if it was not abandoned, the duration of the stop until Daniels was arrested was reasonable (less than twelve minutes) and Trooper Harman engaged in reasonable questioning of Daniels during the diligent investigation. Id. at 39-42.

### 2.    Challenge to Search of the Vehicle

Daniels challenged the search of the black Mercedes based on his contention that the K-9 alert was unreliable. Mot. to Suppress 2 at 5-6. The Magistrate Judge found that the probable cause and reasonable suspicion to stop the vehicle gave them permission to deploy a K-9 for a free-air sniff of the vehicle, which alerted the officers to the odor of narcotics. R&R at 42-44. This gave the officers under the automobile exception to the warrant requirement permission to conduct a more extensive search of the vehicle. Id. at 44. The Magistrate Judge also rejected Daniels's challenge to the reliability of the K-9 based upon the credible testimony of Trooper Swain. Id. at 44-47.

### 3.    Challenge to the Search Warrant

Daniels challenged the affidavit submitted in support of the search warrant for his residence as insufficient to establish probable cause, arguing that it was based upon information that was stale and that the purported misrepresentation of some of the material facts and withholding of other facts that "would have negated

any indicia of probable cause," entitling Daniels to a <u>Franks</u>[6] hearing.  Mot. to

Suppress 1 at 1-2, 5-12.  The Magistrate Judge determined that Daniels is not

entitled to a <u>Franks</u> hearing because there was a failure to make a substantial

showing that there was material information intentionally or recklessly omitted

from the affidavit and, even if the affidavit was revised to include the omitted

information, there still would have been probable cause to search the premises.

R&R at 13-15.  The Magistrate Judge also found that the search warrant affidavit

"provided sufficient facts to establish probable cause to believe that evidence

involving the alleged narcotics trafficking conspiracy among PGF members would

be found in Daniels' residence."  <u>Id.</u> at 18-21.  The Magistrate Judge rejected

Daniels's staleness argument because the investigation of the PGF began in 2019,

was an ongoing protracted criminal conspiracy, and continued until after Daniels's

arrest.  <u>Id.</u> at 21-25.

     The Magistrate Judge finally determined that, even if the search warrant was

somehow invalid, the evidence seized from Daniels's residence should not be

suppressed because the agents executing the warrant reasonably relied in good

faith upon its validity.  <u>Id.</u> at 25.  The Magistrate Judge rejected Daniel's

---

[6] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

contention that the affidavit was so lacking in indicia of probable cause to render a good faith belief in its validity to be unreasonable. Id. at 26-27.

### B.    Daniels's Objections

#### 1.    Attempt to Incorporate Prior Arguments from Briefing Before the Magistrate Judge

At the beginning of his objections, Daniels "incorporates his prior motions, adopted motions, briefs, and replies on the issues[.]" Def.'s Objs. at 1. These are invalid objections. See United States v. Dulaney, No. 1:23-CR-0066-MHC-CCB-2, 2024 WL 3913495, at *2 (N.D. Ga. Aug. 23, 2024) (citing cases which hold that a party who incorporates prior filings does not state valid objections to a report and recommendation). Accordingly, the Court will not review the prior arguments made by Daniels to the Magistrate Judge, but only will consider specific objections made to the R&R.

#### 2.    Objections to the Traffic Stop

Daniels objects to the Magistrate Judge's recommendation which credits Trooper Harman's testimony about believing the window tint on the black Mercedes to be in excess of that permitted under Georgia law and that Daniels "cut off" traffic upon his turning into the scrapyard. Def.'s Objs. at 8.

A district court is not required to rehear witness testimony when accepting a magistrate judge's credibility findings. United States v. Raddatz, 447 U.S. 667,

680-81 (1980); United States v. Thompson, 422 F.3d 1285, 1297 (11th Cir. 2008).
"[I]n evaluating the factual version of events between the law enforcement officer
[ ] and [the defendant], we should defer to the magistrate judge's determinations
unless his understanding of the facts appears to be 'unbelievable.'" United States
v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (citing United States v.
Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985)); see also United States v. Emanuel,
440 F. App'x 881, 883 (11th Cir. 2011) (according "substantial deference" to the
credibility determinations made by the magistrate judge where the defendant
"failed to show that the magistrate [judge]'s understanding of the facts is not
plausible or permissible . . . .").

    This is not one of those "rare cases" in which the transcript of the
evidentiary hearing presents a basis for rejecting the Magistrate Judge's resolution
of credibility.  United States v. Marshall, 609 F.2d 152, 155 (5th Cir. 1980);[7] see
also United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001) ("This is not
the 'rare case' discussed in Marshall, as the transcript here provides no basis to
reject the magistrate judge's credibility findings.").  Indeed, the only reason given

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc),
the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions
handed down prior to the close of business on September 30, 1981.

by Daniels for arguing that Trooper Harman's testimony was not credible was that the dash cam purportedly showed that "[t]he windows of the Mercedes appeared to have a normal tint similar to any other vehicle on the roadway." Def.'s Objs. at 8. But Trooper Harman's testimony was that the darkness of the window tint prevented him from seeing the silhouette of the driver or the outline of the seats. Tr. at 76. Trooper Harman also testified that, based on his training and experience with the GSP (ten years since trooper school and five years patrolling interstate highways as part of the criminal interdiction unit), the inability to see the outline of a person through the driver's window is an indication that the window tint exceeds the measurement allowed by Georgia law. Id. at 59-60, 77.

This case is similar to United States v. Garcia, 284 F. App'x 791, 793 (11th Cir. 2008):

> At the time he decided to stop Garcia's truck, Officer Threat knew that: (1) Georgia law prohibited excessively tinted windows; (2) he could not see inside the vehicle; and (3) he could not see the driver. This information was sufficient to lead a reasonable officer to believe that Garcia had violated [O.C.G.A.] § 40-8-73.1(b) by operating a motor vehicle with window tinting that exceeded the allowable limits. Accordingly, the district court correctly concluded that Officer Threat had probable cause for the stop, regardless of whether the tinting was actually illegal.

Id. at 793. The same is true in this case. Daniels presents no articulable basis for rejecting the determination of the Magistrate Judge that Trooper Harman's testimony was credible on the issue of the darkness of the window tint.

Similarly, Daniels alleges that the left turn he made into the scrapyard did not "cut off" any vehicles. The Magistrate Judge cited Trooper Harman's testimony that Daniels violated the failure to yield right of way state law as an additional violation witnessed by the officer and which provided "another basis" for the traffic stop. R&R at 35. Daniels presents no evidentiary basis for rejecting Trooper Harman's testimony on this point.

Finally, Daniels objects to the Magistrate Judge's alternative conclusion that the "collective knowledge" of law enforcement officers provided a basis for the traffic stop. Def.'s Objs. at 9; see R&R at 36-39. Daniels does not provide any specific reasons for such an objection other than contending that officers just had a "hunch" of illegal drug trafficking. Def.'s Objs. at 9.

The Fourth Amendment provides that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

However, the police "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000); see also Terry v. Ohio, 392 U.S. 1, 30-31 (1968); United States v. Jordan, 632 F.3d 1181, 1186 (11th Cir. 2011) (concluding that under the Fourth Amendment, law enforcement officers may conduct a Terry stop when (1) the officers have reasonable suspicion the suspect is involved in criminal activity and (2) the stop is "reasonably related in scope to the circumstances which justified the interference in the first place.").

> Reasonable suspicion demands "considerably less" than probable cause, but "the police are required to articulate some minimal, objective justification for the stop." United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996). That justification may be based on the information available to the officer at the time. See [United States v.] Arvizu, [534 U.S. 266,] 273 [(2002)].

United States v. Webster, 314 F. App'x 226, 229 (11th Cir. 2008) (parallel citations omitted).

To determine whether reasonable suspicion exists, the court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." Arvisu, 534 U.S. at 273 (citation omitted). Examining the totality of the circumstances "allows officers to draw on their own experience and specialized

18

training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. (quotation and citation omitted). The court should give due weight to an officer's experience and expertise when evaluating reasonable suspicion. Ornelas v. United States, 517 U.S. 690, 699 (1996); see also United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2000) ("[g]reat deference is given to the judgment of trained law enforcement officers on the scene.") (internal quotation marks and citation omitted).

After review of the totality of the circumstances in this case, the Court finds that Trooper Harman had reasonable suspicion to believe that Daniels was involved in the distribution of illegal narcotics with another member of the PGF and could proceed with an investigative stop under Terry. The following facts within the collective knowledge of law enforcement and were communicated to Trooper Harman supported the stop: (1) Trooper Harman has been observed or been briefed of the activities seen by the pole camera in which suspected members of the PGF were observed passing a white trash bag suspected of containing controlled substances; (2) the black Mercedes was observed pulling up next to one of the vehicles previously involved in a suspected drug transaction; and (3) agents

observed what appeared to be the same white trash bag being placed in the trunk of the black Mercedes.

This Court agrees with the Magistrate Judge that "Trooper Harman had probable cause to stop Daniels for the window tint violation and traffic violation, and the stop was also justified by reasonable suspicion that the vehicle contained evidence of drug trafficking." R&R at 39. Daniels's objections to the basis for the traffic stop are **OVERRULED**.

### 3.    Objections to the K-9 Alert

Daniels asserts that, in finding that there was probable cause to search the black Mercedes, the Magistrate Judge "incorrectly deferred to the subjective interpretations of Trooper Swain as to how K-9 Ozon responds to odors." Def.'s Objs. at 10. In Florida v. Harris, 568 U.S. 237 (2013), the Supreme Court addressed which types of dogs can provide probable cause for a search for drugs:

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

Id. at 246-47 (2013); see also United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982) (endorsing the view that "training of a dog alone is sufficient proof of reliability"); United States v. Nelson, 309 F. App'x 373, 375 (11th Cir.

2009) (per curiam) ("A dog sniff must be sufficiently reliable in order to establish probable cause, and this reliability is generally present if the dog is 'well-trained.'" (quoting Illinois v. Caballes, 543 U.S. 405, 409 (2005))).

As stated by the Magistrate Judge, the record includes evidence of the drug detecting canine's successful training and certification as a drug detection dog, as well as his handler's certification. Tr. at 148-52. The dog sniff was performed on the exterior of the black Mercedes while Daniels was lawfully stopped for a traffic violation. Daniels presented no evidence which conflicted with these certifications or refuted the K-9's successful completion of his training program. And, although Daniels challenges the Magistrate Judge's crediting the K-9's handler's interpretation of how the dog responds to odors, he presents no contradictory evidence that such testimony is less than credible. See United States v. Braddy, 11 F.4th 1298, 1313 (11th Cir. 2021) ("[W]e conclude that the district court's finding in crediting the officers' testimony over the testimony of Braddy's expert was not clearly erroneous. In crediting the officers' testimony, the district court noted that the officers' version of events was consistent with the video evidence and the officers' explanation of their training.").[8] Daniel's objection is **OVERRULED**.

---

[8] Daniels chooses to rely on the dissenting opinion in Braddy, Def.'s Objs. at 10, but this Court is bound by the precedent set in the majority opinion. In any event, unlike in Braddy where there was contrary expert opinion offered by the defendant,

### 4.    Objections to the Search Warrant of Daniels's Residence

### a.    Whether a <u>Franks</u> Hearing Was Required

In his motion to suppress the items obtained from his residence pursuant to a search warrant, Daniels argued that he was entitled to a <u>Franks</u> hearing because there were five instances where Agent Tice "deliberately omitted information and misled the issuing judge in his affidavit[.]"  Mot. to Suppress 1 at 10.  The Magistrate Judge determined that Daniels failed to show that the information was intentionally or recklessly omitted or that the purported omitted information undermined the probable cause determination, and that even if the affidavit include the omitted information, the affidavit would still have established probable cause for the search.  R&R at 11-15.  Other than making the same arguments made before the Magistrate Judge, Daniels contends that the Magistrate Judge "misapplied the facts to the law and came to the incorrect conclusion" that a <u>Franks</u> hearing should not be granted.  Def.'s Objs. at 3-4.

> The Fourth Amendment requires a hearing to be had at the defendant's request "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  <u>Franks</u>, 438 U.S. at 155–56.  "Omissions made

---

Daniels offers nothing to discredit Trooper Swain's testimony concerning his K-9's behavior.

negligently or because of an innocent mistake are insufficient to warrant suppression of the evidence." United States v. Whyte, 928 F.3d 1317, 1333 (11th Cir. 2019). Furthermore, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause. United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009). The defendant bears the burden of showing that the omissions would defeat a probable cause determination. Franks, 438 U.S. at 171. The defendant's attack "must be more than conclusory." Id. The district court, when making a probable cause finding, considers the totality of the circumstances to determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983) (parallel citations omitted).

United States v. Weathers, 815 F. App'x 414, 419 (11th Cir. 2020) (parallel

citations omitted).

The information which Daniels contends was deliberately omitted by Agent

Tice in the warrant application is as follows: (1) almost three weeks before the

application, a TFO did not see any suspicious activity at the Ferncrest residence;

(2) the address for a suspected stash house was different than the address for the

Ferncrest residence, leaving the impression that there were two stash houses;

(3) photos of drug ledgers were provided without a basis for believing they were

located at the Ferncrest residence as opposed to the stash house; (4) there is no

indication that the Ferncrest residence is not owned by Daniels; and (5) there is no

evidence to suggest Daniels's continued to anticipate in the alleged conspiracy

after the December 29, 2022, traffic stop and arrest. Mot. to Suppress 1 at 11-12.

The Magistrate Judge considered each purported omission and concluded that none of this information created a presumption of recklessness and, even if the information had been included, the revised affidavit would have established probable cause to search the residence.

> [T]here was no assertion that Daniels was conducting narcotics trafficking transactions from 4725 Ferncrest Place, so the fact that suspicious activity was not observed during three minutes of surveillance of the residence is of no consequence. As for the ownership of the residence, the distinction between the residence and Daniels' alleged stash house, and the reason Agent Tice believed the items sought would be located at 4725 Ferncrest Place, Agent Tice attested that drug traffickers and money launderers often kept records of their transactions in "secure yet readily accessible place[s]," such "as in homes," in addition to cellphones and electronic devices that contain contact lists, photographs, videos, text messages, call records, and other valuable information, and geo-location data from Daniels' ankle monitor supported 4725 Ferncrest Place "being the current residence of [Daniels]," see [Doc. 381-1 at 5-7 ¶ 10, 57-58 ¶¶ 130-32]. Finally, although Daniels contends that Agent Tice "never shows the issuing judge any evidence that implies or suggests [] Daniels has continued his participation in the alleged conspiracy after the December 29, 2022[,] traffic stop and seizure," [Doc. 381 at 12], Agent Tice attested that a search warrant was obtained for cellular devices seized from Daniels at the time of his arrest on December 29, 2022, and the search revealed that he was in frequent contact with Wash, that he was sending text messages to individuals who appeared to be drug customers, and there were "multiple photographs in his phone of drug ledgers (containing hundreds of thousands of dollars), prices of drugs, and photographs of large amounts of drugs," [Doc. 381-1 at 58 ¶ 131]; see also [id. at 47 ¶ 101]; (Tr. at 118).

R&R at 14-15.

When a "magistrate judge undertook the evaluation prescribed by <u>Franks</u> and considered the affidavit with the omissions and additions proposed by [the d]efendant," the trial court does not err in declining to hold a <u>Franks</u> hearing. <u>Kapordelis</u>, 569 F.3d at 1309-10. This Court agrees that none of the omissions are so material to the probable cause determination that there is a presumption that the failure to include them in the warrant application was intentional or reckless. Moreover, even if the factual omissions in the affidavit supporting the search of the residence were knowing and intentional or in reckless disregard of the truth, their inclusion would not have prevented a finding of probable cause. Consequently, Daniels failed to make a substantial preliminary showing to require a <u>Franks</u> hearing, and his objection is **OVERRULED**.

### b.    Whether There was Probable Cause to Search the Residence

Daniels next objects to the Magistrate Judge concluding that there was a nexus between the residence sought to be searched and the purported criminal activity in order to establish probable cause for the search of the residence. Def.'s Objs. at 4-6.

The Fourth Amendment provides the right to be free of unreasonable searches and seizures, and mandates "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "Probable

cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). The task of a judge issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the [judge] had a 'substantial basis ... for conclud[ing]' that probable cause existed." Gates, 462 U.S. at 238-39 (citation omitted). In cases involving hearsay information, the magistrate judge must examine the "veracity" and "basis of knowledge" of the person supplying the information. Id. at 238. Furthermore, probable case "is a fluid concept – turning on the assessment of probabilities in particular factual contexts." Brundidge, 170 F.3d at 1352 (quotation and citation omitted). The magistrate judge may also rely upon the opinions and conclusions of an experienced law enforcement officer-affiant. United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995).

The Court finds that the affidavit in support of the search warrant for the Ferncrest residence provided the magistrate judge who signed the warrant with a

substantial basis for concluding that probable cause was established for the search. Agent Tice's affidavit included the following:

- Geo-location data from Daniels's ankle monitor (which Daniels wore as a prior bond condition) frequently placed him as the Ferncrest residence during night and early morning hours (SW Aff. ¶ 130).

- A search warrant of cellular devices from Daniels revealed that Daniels was in frequent contact with Wash via encrypted text messages on the day of Daniels's arrest and exchanged texts with other suspected drug customers providing an address of a suspected stash house (Id. ¶ 131).

- Daniels's cell phone also contained multiple photographs of drug ledgers, prices of drugs, and large amounts of drugs (Id.),

- In the experience of the affiant, drug traffickers maintain controlled substances and documents related to their drug trafficking in their residence (Id. ¶ 10(g)).

Courts in this circuit have frequently affirmed findings of probable cause to support the search of a suspect drug trafficker's residence. See R&R at 20-21 (citing cases); see also United States v. Acosta, 807 F. Supp. 2d 1154, 1217 (N.D.

Ga. 2011) ("For the vast majority of drug dealers, the most convenient location to secure items is the home. After all, drug dealers don't tend to work out of office buildings. And no training is required to reach this commonsense conclusion.") (quoting United States v. Spencer, 530 F.3d 1003, 1007-08 (D.C. Cir. 2008)). This Court finds that Agent Tice's affidavit supported probable cause to search the Ferncrest residence, and Daniels's objection is **OVERRULED**.

### c.  Whether the Information in the Affidavit Was Stale

Daniels's argument that the information contained in Agent Tice's affidavit was stale because it failed to show a conspiracy between the date of the traffic stop and the warrant application was rejected by the Magistrate Judge. R&R at 21-25. Daniels objects because the Magistrate Judge purportedly "misapplied the facts to the law in this circumstance" because the information related by Agent Tice was four months old. Def.'s Objs. at 6-7.

"[T]he information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000). There is not a bright-line rule for how long information stays fresh or when it becomes stale. Id. at 1265; see also United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1990) ("When reviewing staleness challenges we do not apply some talismanic rule which establishes

arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented."). "In this case-by-case determination we may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched. Harris, 20. F.3d at 450. "[P]robable cause quickly dwindles with the passage of time" in the case of suspected criminal activity that is isolated, but "time is of less significance" in the case of suspected criminal activity that is protracted or continuous. Bervaldi, 226 F.3d at 1265. Time likewise is of less significance if the location of suspected criminal activity is the defendant's residence. "Residence in a house, like protracted and continuous criminal activity . . . generally is not transitory or ephemeral, but instead endures for some length of time." Id.

In this case, as stated in Agent Tice's affidavit, DEA Agents had been investigating the PGF since June 2019 and continued through April 21, 2023, just days before the application. SW Aff. ¶¶ 11, 30, 54-55. Within that conspiracy, Daniels purchased five kilograms of cocaine on December 29, 2022, and apparently had other drug customers. Id. ¶¶ 51, 53, 131. The fact that the warrant for the Ferncrest residence was made four months after Daniels's arrest did not

make the supportive evidence stale when there was a continuous and ongoing drug

trafficking conspiracy. R&R at 23-25 (citing cases). Accordingly, the Magistrate

Judge did not misapply the facts to the law, and Daniels's staleness objection is

**OVERRULED**.

### d. Whether the Good Faith Exception Would Apply

Finally, Daniels contends that the Magistrate Judge "misapplied the facts'

and "erred in its conclusion" that the "good faith exception" recognized in United

States v. Leon, 468 U.S. 897 (1984), would apply even if the search warrant was

found to be invalid. Def.'s Objs. at 7-8. Once again, Daniels "incorporates his

previous arguments regarding probable cause" rather than point to any specific

error committed by the Magistrate Judge, which is not a valid objection. Id. at 7.

The exclusionary rule prohibits the use of evidence seized during or due to

an unlawful search. Murray v. United States, 487 U.S. 533, 536 (1988). "[T]he

exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct,

or in some circumstances recurring or systemic negligence." Herring v. United

States, 555 U.S. 135, 144 (2009). In Leon, the Supreme Court recognized a "good-

faith exception" to the exclusionary rule for evidence "obtained by officers acting

in reasonable reliance on a search warrant issued by a detached and neutral

magistrate but ultimately found to be unsupported by probable cause." 468 U.S. at 900, 924.

Leon states that there are four situations where the good-faith exception does not apply: (1) where the issuing magistrate or judge was misled by information the affiant knew was false or was reckless in determining its veracity; (2) where the issuing magistrate or judge wholly abandoned his judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. Id. at 923.

In his motion to suppress, Daniels argued that the first and third exception applies here. Mot. to Suppress 1 at 6-7. Because this Court already determined that the search warrant affiant did not deliberately omit material information from the search warrant affidavit and that including such information still would have resulted in probable cause for the issuance of the warrant, the first Leon exception does not apply. With respect to the third Leon exception, in determining whether an affidavit lacks indicia of probable cause, the court looks only at the face of the affidavit. United States v. Robinson, 336 F.3d 1293, 1296 (11th Cir. 2003). "[T]he affidavit should state facts sufficient to justify a conclusion that evidence or

contraband will probably be found at the premises to be searched and should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." United States v Morales, 987 F.3d 966, 975 (11th Cir. 2021) (quotation marks and citation omitted).

For the reasons previously discussed in this Order, the supporting affidavit was not so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable. The affidavit established a link between the residence and the criminal activity. The affidavit also contained sufficient information to establish a likelihood that that evidence sought would be found in the place to be searched. Consequently, the Court finds that the affidavit contains enough indicia of probable cause that reliance upon the warrant was not entirely unreasonable even if it was somehow defective. Daniels's objection therefore is **OVERRULED**.

## IV.  CONCLUSION

Accordingly, after a *de novo* review of those portions of the R&R to which Daniels objects, the Court **OVERRULES** his objections [Doc. 750]. Finding no clear error in the remaining portions of the R&R, the Court **ADOPTS** the R&R [Doc. 737] as the Opinion and Order of the Court.

It is hereby **ORDERED** that that Daniels's Motion to Suppress Search Warrant and Request for Franks Hearing [Doc. 381] and Daniels's Motion to Suppress Search and Seizure of Defendant's Vehicle Resulting From Unconstitutional Traffic Stop and K-9 Search [Doc. 382] are **DENIED**, and Daniels's Perfected Motion to Suppress to Address Standing for Doc. 381 [Doc. 416] is **DENIED AS MOOT**.

It is further **ORDERED** that the time between the date the Magistrate Judge certified this case ready for trial on February 7, 2025, and the issuance of this Order, shall be excluded in calculating the date on which the trial of this case must commence under the Speedy Trial Act because the Court finds that the delay is for good cause, and the interests of justice in considering Defendant's objections to the Report and Recommendation ruling on his pretrial motions to suppress outweigh the right of the public and the right of the Defendant to a speedy trial, pursuant to 18 U.S.C. § 3161(h)(1)(D).

It is further **ORDERED** that the time between the date the Magistrate Judge certified Solomon ready for trial on February 7, 2025, and the date the final orders

on his co-Defendants' pre-trial motions are issued also shall be excludable under

18 U.S.C. § 3161(h)(6).[9]

    **IT IS SO ORDERED** this 8th day of April, 2025.

_Mark H. Cohen_
_____

MARK H. COHEN
United States District Judge

---

[9] Co-Defendant Alexavier Negron still has a pending Magistrate Judge's Report and Recommendation to which objections and responses have been filed, and the Speedy Trial clock will not resume for Defendant Daniels and the other Defendants until a final order on that R&R have been filed.